#24892, 24904-rev & aff in pt & rem-JENSEN, Circuit Judge
**2009 SD 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DAKOTA, MINNESOTA & EASTERN
RAILROAD CORPORATION,                          Plaintiff and Appellant,

　　　v.

ACUITY, a Mutual Insurance Co.
f/k/a HERITAGE MUTUAL INSURANCE
COMPANY, d/b/a HERITAGE INSURANCE,          Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE ROBERT L. TIMM
Judge

\* \* \* \*

BRIAN J. DONAHOE
MEREDITH A. MOORE
WILLIAM D. SIMS of
Cutler & Donahoe, LLP                          Attorneys for plaintiff
Sioux Falls, South Dakota                      and appellant.


JENNIFER L. WOLLMAN
GARY P. THIMSEN of
Woods, Fuller, Shultz & Smith PC               Attorneys for defendant
Sioux Falls, South Dakota                      and appellee.

\* \* \* \*

ARGUED
JANUARY 13, 2009

OPINION FILED 8/5/09

#24892, 24904

JENSEN, Circuit Judge

[¶1.]     Dakota, Minnesota and Eastern Railroad (DM&E) filed this action claiming that Acuity, f/k/a Heritage Mutual Insurance Co. (Acuity), engaged in bad faith and vexatious failure to pay uninsured motorist (UM) benefits. DM&E appeals the circuit court's entry of summary judgment on the claims. Acuity cross-appeals the circuit court's discovery orders compelling Acuity's attorneys to give a deposition in the case.

FACTUAL BACKGROUND

[¶2.]     On July 28, 1998, DM&E employee Julian Olson (Olson) was seriously injured in a motor vehicle accident while acting in the scope of his employment. DM&E held a business automobile policy with Acuity, which provided liability and UM coverage. Olson sued DM&E under the Federal Employer's Liability Act (FELA) alleging negligent maintenance of the vehicle's Hy-Rail System.[1] Acuity refused to defend the suit claiming the policy excluded coverage. On the final day of the FELA trial, Olson and DM&E settled for an amount in excess of Acuity's policy limits. Acuity did not participate in or contribute toward the settlement. There was no judicial determination or admission of any fault by any party in the FELA action.

[¶3.]     DM&E subsequently brought a declaratory judgment action against Acuity claiming that Acuity was obligated to defend and provide coverage for the FELA action. The circuit court granted Acuity's motion for summary judgment concluding that the policy exclusions were valid and barred coverage for Olson's

---

1.    The Hy-Rail System is a device which is attached to the front end of a motor vehicle allowing the vehicle to be driven on railroad tracks and public roads.

accident. This Court affirmed in *DM&E v. Heritage Mut. Ins. Co.*, 2002 SD 7, 639 NW2d 513 (*DM&E I*).

[¶4.]    While *DM&E I* was pending, DM&E filed a suit seeking UM benefits under its policy with Acuity. The suit alleged that the negligence of an unidentified and uninsured motorist was a cause of Olson's injuries, triggering the right to UM benefits under the policy. Later, DM&E amended the complaint to add claims of bad faith and vexatious failure to pay which are the subject of this appeal.

[¶5.]    During discovery on the UM claim, DM&E obtained an insurance coverage opinion dated August 1, 2000, from Acuity's attorney, Gary Thimsen (Thimsen), to Tom Behrend (Behrend), an Acuity field claims manager.[2] Thimsen noted that Olson was claiming a phantom vehicle had cut him off causing the accident, which triggered a potential UM claim. Thimsen's letter asserted that the policy afforded no coverage for the UM claim because "[n]o evidence has been provided by an independent witness . . . to corroborate the facts of the accident as [Olson] has related them."[3] The letter cited the accident report of a state trooper, which noted the existence of knowledgeable witnesses. Thimsen's letter stated that none of the individuals with knowledge had "come forward with information that would verify [Olson's] story." Thimsen also noted the narrative from the accident

---

2.    Thimsen's coverage opinion was written in response to a letter from Olson's attorney on the FELA action putting Acuity on notice that Olson was seeking UM benefits under DM&E's policy.

3.    Thimsen referenced the portion of the UM policy requiring: "[i]f the hit-and-run vehicle does not hit an *insured,* a covered *auto,* or a vehicle an *insured is occupying,* the facts of the *accident* must be corroborated by competent evidence provided by an independent and disinterested person and not by the *insured* or any person *occupying* the same vehicle as the *insured."*

report which stated: (1) Olson began passing a slower moving vehicle; (2) Olson then drifted left, and overcorrected back to the right and then crossed both lanes of traffic, entered the ditch and rolled.

[¶6.] The record shows that three independent witnesses gave statements to DM&E shortly after the accident occurred in 1998. All three witnesses noted the presence of an unusually slow-moving vehicle on the interstate traveling just in front of Olson as he entered onto the highway. One of these witnesses stated her belief that this vehicle caused the accident because it had come to a near stop in front of Olson at the time that Olson was entering onto the interstate.

[¶7.] There was no evidence that Acuity considered these statements in August 2000 or at any other time through September 2001 when DM&E filed the UM claim. There was no showing that Acuity made any attempt during this time to gather facts to assess the fault of Olson, the unidentified driver, or any other party. Acuity did not interview Olson concerning the UM claim.

[¶8.] DM&E deposed Behrend on November 5, 2004, concerning Acuity's investigation of the UM claim. The deposition transcript shows that Behrend knew little about the investigation by Acuity even though he had sole responsibility for the UM claim in-house. Behrend testified in his deposition that Thimsen and his co-counsel exclusively handled the investigation and made the determination on the UM claim.

> Q: Did anyone interview someone from the DM&E railroad in regard to the uninsured motorist claim?
>
> A: In regard to the uninsured motorist claim, that investigation was done by Gary Thimsen and Jennifer Wollman.

Q: When did that take place?

A: I believe it would have been in the summer of 2000, May, June, somewhere in there.

Q: What triggered that investigation?

A: Receipt of possible underinsured or uninsured motorist claim from Julian Olson's attorney . . . .

Q: And what did your investigation reveal?

A: My understanding is that there was no indication that an uninsured motorist was causation of the accident.

Q: What was that based on?

A: Review by the attorneys of discovery documents.

Q: You said discovery documents. You mean lawsuit discovery?

A: Correct.

Q: And what lawsuit was that?

A: The Julian Olson case versus DM&E.

Q: What specifically did they identify as establishing that there was no indication that the uninsured motorist caused the accident?

A: Well, I don't know if I can give you the details. From what I understand, they looked at deposition transcripts that were taken on the various parties.

Q: As we sit here today, could you point to any deposition transcripts in particular that would be the basis for your claim that the uninsured motorist did not cause the accident?

A: No.

* * *

Q: Who else would have knowledge of any investigation that was undertaken by Acuity or Heritage Mutual in this case?

\* \* \*

A: That would just be me.

\* \* \*

Q: Do you know whether they even investigated or attempted to determine whether the unidentified driver may have been at fault in the case?

A: I guess I couldn't really answer that.

Q: As I understand it, the information that you have in regard to whatever happened in the actual accident itself would have come from the attorneys that represent Acuity and Heritage Mutual in this case, correct?

A: Correct.

Q: And is that a common practice for Heritage or Acuity to rely on investigations of attorneys or information from attorneys?

A: It is done periodically—is it done all the time, no. Is it done periodically, yes.

Q: Periodically meaning about how often? Do you have any—

A: Well, I couldn't really give you a percentage. You know, it depends on the circumstances. This is – you know, is an unusual circumstance, I guess you would do it.

\* \* \*

Q: Tell me about any issues that you think were underinvestigated or failed – or DM&E or somebody else failed to investigate about the accident?

A: I guess I'd have to leave that to my attorneys to advise whether or not they feel there was some lack of investigation performed.

[¶9.] After Behrend's deposition, DM&E sought to depose Thimsen and James Moore (Moore)[4] and issued subpoena duces tecums for documents in their possession. DM&E moved to compel the discovery, which Acuity resisted and moved to quash. The circuit court denied Acuity's motion to quash and granted DM&E's motion to compel. Shortly before the circuit court ruled on the motions, Acuity moved to bifurcate the bad faith claim from the UM claim. The bad faith claim was bifurcated and informally stayed by the parties pending resolution of the UM claim.

[¶10.] At the UM trial, Acuity did not contest that the damages exceeded the UM policy limits. The sole issue was fault. The jury rendered a verdict in favor of DM&E on the UM claim, finding that the unknown driver was negligent and the cause of Olson's accident. This Court affirmed in *DM&E v. Acuity*, 2006 SD 72, 720 NW2d 655 (*DM&E II*).

[¶11.] After *DM&E II* was concluded, DM&E's counsel sent a letter to Acuity's counsel requesting that substitute counsel be obtained for Acuity so that the depositions of Thimsen and Moore could proceed consistent with the court's prior order compelling their depositions. It is unclear from the record if Acuity

---

4. Attorney James Moore represented the manufacturer of the Hy-Rail device in the separate federal products liability suit filed by Olson that was settled. Moore is also a shareholder in the same firm as Thimsen, but there is no showing that Moore had any involvement in representing Acuity or investigating the UM claim.

responded to this letter. Subsequently, Acuity's existing counsel filed a motion for summary judgment.

[¶12.] At the trial level, DM&E asserted that fact issues existed for trial and also argued that the summary judgment motion was premature until Acuity obtained substitute counsel so that DM&E could take Thimsen's deposition consistent with the circuit court's earlier order to compel the deposition. The circuit court orally granted the motion for summary judgment without giving any reasoning for its decision, or addressing DM&E's request to delay the motion to take Thimsen's previously ordered deposition.

[¶13.] DM&E argues that issues of material fact exist regarding the reasonableness of Acuity's denial of the UM claim, including Acuity's investigation. DM&E also argues it should have been afforded an opportunity to develop these issues by deposing Thimsen consistent with the court's prior order. Acuity asserts that summary judgment was properly granted because the UM claim was fairly debatable. Acuity cross appeals the circuit court's discovery rulings arguing that the circuit court abused its discretion by granting DM&E's motion to compel and denying Acuity's motion to quash the depositions and subpoenas.

STANDARD OF REVIEW

[¶14.] We review the circuit court's grant of summary judgment under a well-established standard:

> Summary judgment is authorized if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. We will affirm only when there are no genuine

issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. Summary judgment will be affirmed if there exists *any* basis which would support the circuit court's ruling.

Schwaiger v. Avera Queen of Peace Health Servs., 2006 SD 44, ¶ 7, 714 NW2d 874, 877 (citation omitted) (emphasis in original). "The non-moving party, however, cannot merely rest on its pleadings; it must point to specific facts which establish a genuine, material issue for trial. Mere allegations are not sufficient to avoid summary judgment." *Id.* ¶ 7, 714 NW2d at 878 (internal citations omitted).

ISSUE ONE

[¶15.]    **Whether the circuit court erred in granting Acuity's motion for summary judgment on the bad faith and vexatious failure to pay claims.**

[¶16.]    DM&E claims there are genuine issues of material fact concerning Acuity's initial handling and denial of the UM claim. DM&E also argues that questions of fact are created by Acuity's refusal to re-evaluate the UM claim, and in its litigation tactics. We discuss both these claims by DM&E.

*i. Acuity's Investigation and Initial Denial*

[¶17.]    *Champion v. United States Fidelity & Guaranty Co.,* recognized a cause of action for first-party bad faith. 399 NW2d 320, 324 (SD 1987). *Champion* set forth the following test for bad faith, which has been reaffirmed by this Court on numerous occasions:

[F]or proof of bad faith, there must be an absence of a reasonable basis for denial of policy benefits [or failure to comply with a duty under the insurance contract] and the

-8-

> knowledge or reckless disregard [of the lack] of a reasonable basis for denial, implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.
>
> Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.

Walz v. Firemen's Fund Ins. Co., 1996 SD 135, ¶ 7, 556 NW2d 68, 70 (quoting *Champion*, 399 NW2d at 324) (alterations in original).

[¶18.]    Recently, this Court stated that "[f]irst-party bad faith . . . is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its *processing* or *paying* of policy benefits to its insured."  Hein v. Acuity, 2007 SD 40, ¶ 10, 731 NW2d 231, 235 (citations omitted) (emphasis added).  In the first-party context, "there exists a contractual relationship, whereby the insurer has accepted a premium from its insured to provide coverage." *Id.* ¶ 13, 731 NW2d at 236.  Because of the nature of this relationship, "[w]e recognized in *Julson* that bad faith can extend to situations beyond mere denial of policy benefits." *Id.* (citing Julson v. Federated Mut. Ins. Co., 1997 SD 43, ¶ 6, 562 NW2d 117, 119).

[¶19.]    Bad faith conduct may include the failure to conduct a reasonable investigation concerning the claim. *Walz*, 1996 SD 135, ¶ 8, 556 NW2d at 70 (citing Isaac v. State Farm Mut. Auto Ins. Co., 522 NW2d 752, 758 (SD 1994)).  "The issue is determined based upon the facts and law available to [the] [i]nsurer at the time it

made the decision to deny coverage." *Id.* The question of whether an insurer has acted in bad faith is generally a question of fact. *Id.*

[¶20.] Since *Champion*, we have recognized the right of an insurer to challenge claims which are fairly debatable. If the claim is fairly debatable, then the insurer has a reasonable basis to deny the claim:

> If an insured's claim is fairly debatable either in fact or law, an insurer cannot be said to have denied the claim in bad faith. The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish that the insurer had a reasonable basis to deny the claim. The focus is on the existence of a debatable issue, not on which party was correct.

46A CJS *Insurance* § 1873 (2008).

[¶21.] The parties are sharply divided over whether the claim was fairly debatable and when that determination should be made. Our case law requires that the insurer's decision and actions must be reviewed "at the time it made the decision to deny coverage." *See Walz*, 1996 SD 135, ¶ 8, 556 NW2d at 70. The questions of whether the insurer's actions were unreasonable or whether the claim was fairly debatable must be viewed at the time the insurer made the decision to deny or litigate the claim, rather than pay it.

[¶22.] DM&E argues that Thimsen's opinion letter alone establishes a genuine issue of material fact. DM&E reasons that Acuity failed to properly investigate and evaluate the validity of the UM claim because of Thimsen's faulty conclusion that there were no independent witnesses to corroborate the UM claim. It posits that this creates an inference of bad faith for trial. DM&E also points to Acuity's failure to re-evaluate its decision as it received additional facts supporting

the UM claim. Acuity counters that it is entitled to summary judgment so long as there was some defense of law or fact to the UM claim that made it fairly debatable, regardless of the reasonableness of Acuity's investigation or handling of the claim.

[¶23.]    Courts which apply the fairly debatable standard have held that the adequacy of the investigation and consideration of the claim by the insurer is relevant in determining whether a claim is fairly debatable. In *Anderson v. Continental Insurance Co.*, the Wisconsin Supreme Court stated:

> It is appropriate, in applying the test, to determine
> whether a claim was properly investigated and whether
> the results of the investigation were subjected to a
> reasonable evaluation and review. In the instant case,
> insofar as the complaint alleges, the insurer and the other
> defendants refused even to consider the nature and extent
> of the plaintiffs' damages, and specifically rejected and
> spurned the opportunity to evaluate and consider the
> submitted proof of loss. The pleading of the plaintiffs was
> sufficient in this respect.

271 NW2d 368, 377 (Wis 1978); *see also* Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Ins. Co., 661 NW2d 789, 796 (Wis 2003) ("[I]t is proper when applying the bad faith test to determine whether a[n] [insurance] claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review"); Skaling v. Aetna Ins. Co., 799 A2d 997, 1011 (RI 2002) ("The insurer's failure to conduct an appropriate and timely investigation may subject the insurer to bad faith liability notwithstanding the merits of the claim"); Farmland Mut. Ins. Co. v. Johnson, 36 SW3d 368, 376 (Ky 2000) ("whether a claim or the amount . . . is fairly debatable is a question of fact for the jury and . . . the fact of a disputed amount does not relieve the insurer of its duty to handle the claim fairly"); Zilisch v. State Farm Mut. Auto. Ins. Co., 995 P2d 276, 280 (Ariz

2000) ("The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably . . . ."); S.W. Energy Corp. v. Continental Ins. Co., 974 P2d 1239, 1243 (Utah 1999) (affirming summary judgment on a bad faith claim where the claim was fairly debatable and there was nothing suggesting the insurer was dilatory or unreasonable in its investigation); Dolan v. Aid Ins. Co., 431 NW2d 790, 794-95 (Iowa 1988) (citing *Anderson* for the requirement that the test should be applied in the context of determining the adequacy of the investigation, evaluation and review).

[¶24.] In this case, the facts suggest that the UM claim was denied because Acuity concluded there were no independent witnesses to support Olson's claim that the unidentified driver caused the accident. Based upon this apparent erroneous conclusion, Acuity did not conduct any further investigation into the accident. Acuity has provided no explanation of how or why it reached this conclusion. Further, Acuity has not shown that it made attempts to interview the insured, interview the eye-witnesses to the accident that it knew existed, or investigate any of the actual facts of the accident.

[¶25.] The accident report reviewed by Thimsen was sketchy as to how the accident occurred and did not contain any witness statements. While the report does not specifically attribute fault to the unidentified driver, neither does it exonerate the driver. Likewise, the report is inconclusive as to why Olson may have appeared to overcorrect just as he was attempting to move around the unidentified vehicle. Questions of fact exist as to whether Acuity failed to conduct a

thorough investigation and subject the results of the investigation to "reasonable evaluation and review." *See Trinity Evangelical Lutheran Church & School-Freistadt*, 661 NW2d at 796.

[¶26.]    Acuity's statement of material facts and its argument are devoid of any mention of the investigation or analysis made by Acuity concerning the UM claim at the time it denied the claim. Because of the meager investigation it is *unclear* what facts were available to suggest the claim was fairly debatable at the time Acuity denied the claim. On summary judgment, Acuity has the initial burden to "*clearly* show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." Hahne v. Burr, 2005 SD 108, ¶ 6, 705 NW2d 867, 870-71 (citations omitted) (emphasis added). Further, all reasonable inferences from the facts must be viewed in favor of DM&E. *Id.*

[¶27.]    Acuity relies heavily on the fact that at both the summary judgment and the directed verdict stages of the UM case, the circuit court determined that fact questions existed as to fault. Acuity also cites the deposition of Olson's attorney taken in December 2004. Olson's counsel testified that he believed the UM claim was not as strong as other theories of liability against DM&E and the manufacturer of the Hy-Rail System. These events and facts arose some three years after Acuity denied the UM claim. Without submitting facts showing that the claim was fairly debatable in 2000, Acuity also argues that DM&E's actions during this time suggest that a UM claim did not exist. These facts are insufficient to show that the claim was fairly debatable *at the time Acuity made its decision to*

*deny the claim.* A similar scarcity of such facts exists up through September 2001 when DM&E filed the UM claim.

[¶28.] Acuity cites *National Savings Life Insurance Co. v. Dutton,* in support of its claim that summary judgment is appropriate. 419 So2d 1357 (Ala 1982). The *Dutton* court stated:

> In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.

*Id.* at 1362. The Alabama Supreme Court has since limited this rule. In *Safeco Ins. Co. of America v. Sims*, the court held that the directed verdict rule "is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff's motion for a directed verdict on the contract." 435 So2d 1219, 1224 (Ala 1983). In *Thomas v. Principal Financial Group*, the court held that the directed verdict rule should not apply where an insurer "intentionally or recklessly failed to properly investigate the claim or to subject the result of the investigation to a cognitive evaluation and review." 566 So2d 735, 744 (Ala 1990).[5]

---

5.  Other courts have been critical of the directed verdict rule and held that a jury should generally determine whether a claim is fairly debatable. *Skaling*, 799 A2d at 1010; *Zilisch*, 995 P2d at 280; *Farmland Mut. Ins. Co.*, 36 SW3d at 376.

[¶29.]     The directed verdict rule is not consistent with our established case law. The directed verdict rule focuses on the question of whether a defense of law or fact exists at the time of the trial on the underlying claim. This is not the standard for bad faith in South Dakota. The question for bad faith is whether the insurer's investigation or decision to deny a claim was unreasonable and was made in knowing or reckless disregard of the facts at the time the insurer made its decision to litigate rather than to settle.

[¶30.]     Acuity also cites *Bellville v. Farm Bureau Mutual Ins. Co.,* in support of its argument that the claim is fairly debatable as a matter of law. 702 NW2d 468 (Iowa 2005). In *Bellville*, the Iowa Supreme Court stated that the question of whether a "claim is fairly debatable can generally be decided as a matter of law."[6] *Id.* at 473. The court in *Belville* reasoned that "[w]here an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law." *Id.* (citation omitted).[7]

[¶31.]     *Bellville* involved appellate review of a bad faith claim following a fully developed trial record. Further, the facts raised no question as to the adequacy of the investigation or the evaluation of the claim by the insurer. On such a record, the court in *Bellville* determined as a matter of law that the claim was fairly

---

6.     The *Belville* court noted exceptions to the general rule, including situations where there are disputes concerning the underlying facts of a case. *Id.* at 474.

7.     Iowa has also rejected the directed verdict rule. Reuter v. State Farm Mut. Auto. Ins. Co., Inc., 469 NW2d 250, 254 (Iowa 1991). The court in *Belville* noted that there may be times, although inapplicable in that case, where the fairly debatable question is a question of fact, such as where the underlying facts are disputed. 702 NW2d at 474.

debatable because it was "undisputed that evidence existed creating a genuine dispute as to the negligence of an uninsured or underinsured motorist" at the time the decision was made to deny benefits. *Id*. at 474. Such a record does not exist in this case.

[¶32.]    Jury questions remain concerning whether Acuity's investigation and denial of the UM claim was unreasonable, and whether it knew or recklessly disregarded the lack of a reasonable basis for denial under the policy. Fact questions also exist as to whether the claim was fairly debatable. Because Acuity has failed to show the absence of genuine issues of material fact, the circuit court's entry of summary judgment on the bad faith and vexatious failure to pay claims is reversed and the matter is remanded for further proceedings.

*ii. Acuity's Litigation Conduct*

[¶33]    DM&E contends that Acuity acted in bad faith when it continually refused to reassess its position after the UM claim was filed. DM&E describes the evidence presented during the UM case as "overwhelming" and demonstrative of Acuity's intransigence. DM&E also argues that Acuity's tactics and decisions during the UM claim litigation were further evidence of bad faith. Specifically, DM&E references the following: (1) Acuity's decision not to hire an expert in the UM case; (2) Acuity's repetitive attempts "to appeal interlocutory rulings against it when those rulings could be later appealed without prejudice;" (3) Acuity's claim of privilege to avoid DM&E's requests for discovery; (4) Acuity's failure to settle despite the quick jury verdict; and (5) Acuity's failure to pay the judgment or offer to fairly settle even on appeal. Although we reverse the circuit court's entry of

summary judgment, we address these arguments because the issue is likely to arise on remand.

[¶34.]    In *Walz*, this Court stated that an insurer may have an obligation to timely reassess its initial decision denying coverage based upon information received subsequent to the initial decision. 1996 SD 135, ¶ 12, 556 NW2d at 71. This Court has also recognized that an insurer may be held liable for its conduct, in addition to its decision to deny benefits.  *Hein*, 2007 SD 40, ¶ 13, 731 NW2d at 236; *Julson*, 1997 SD 43, ¶ 6, 562 NW2d at 119; s*ee also* Sawyer v. Farm Bureau Mut. Ins., 2000 SD 144, ¶ 19, 619 NW2d 644, 650.  A review of these cases demonstrates that each involved decisions or conduct by the insurer prior to the institution of litigation on the underlying claim.  We have not addressed the admissibility of conduct or decisions by the insurer during the litigation to prove bad faith.

 [¶35.]    Some courts have adopted what has been labeled the "doctrine of continuing bad faith," which was first recognized in *White v. Western Title Insurance Co.*, 710 P2d 309, 320 (Cal 1985); s*ee also* Douglas R. Richmond, *Bad Insurance Bad Faith Law*, 39 Tort Trial & Ins. Prac. LJ 1, 39 (2003).  In *White*, the California Supreme Court held that evidence of low settlement offers and other insurer litigation conduct was admissible to prove bad faith because an insurer's contractual duty of good faith does not terminate even after the parties have become litigation adversaries.  710 P2d at 317-18.

[¶36.]    Since *White*, California appellate courts have narrowed its holding. *See Cal. Physicians' Serv. v. Superior Court*, 12 CalRptr2d 95, 100 (CalCtApp 1992) (concluding that "*White* stands for the proposition that [only] ridiculously low

statutory offers of settlement may be introduced in a bifurcated trial, after liability has been established, as bearing on the issue of bad faith of the insurance company"); Palmer v. Ted Stevens Honda, Inc., 238 CalRptr 363, 368 (Cal CtApp 1987) (rejecting "the suggestion *White* be extended beyond the insurance setting," and stating "once litigation has commenced, the actions taken in its defense are not, in our view, probative of whether defendant in bad faith denied the contractual obligation prior to the lawsuit").

[¶37.]     Most courts have strictly limited the type of post-filing conduct that may be used as evidence of the insurer's bad faith. Scott Turner, Alex Mahler & Rosanne Stafiej, *The Decline of the So-Called Doctrine of Continuing Bad Faith*, 43 Tort Trial & Ins. Prac. LJ 199, 208-09 (2008). Some jurisdictions impose a blanket prohibition on all post-filing conduct as evidence of an insurer's bad faith. *See* Parker v. S. Farm Bureau Cas. Ins., 935 SW2d 556, 562 (Ark 1996); Morris v. J.C. Penney Life Ins. Co., 895 SW2d 73, 78 (MoCtApp 1995); Roussalis v. Wyo. Med. Ctr., Inc., 4 P3d 209, 257 (Wyo 2000).

[¶38.]     In jurisdictions that allow evidence of an insurer's settlement behavior and other post-filing conduct, appellate courts have markedly restricted the admissibility of such evidence.[8] Courts have found that public policy favors

---

8.     *See* Palmer by Diacon v. Farmers Ins. Exch., 861 P2d 895, 914 (Mont 1993) ("Indeed, courts rarely should allow [evidence of post-filing conduct] and we have adopted a balancing test for those rare circumstances"); Gooch v. State Farm Mut. Auto. Ins. Co., 712 NE2d 38, 42-43 (IndCtApp 1999) (applying the balancing test enunciated in *Palmer, supra*); Timberlake Const. Co. v. U.S. Fid. & Guar. Co., 71 F3d 335, 340-41 (10thCir 1995) (applying Oklahoma law) (holding that post-filing conduct should rarely be admissible to prove bad faith); Sims v. Travelers Ins. Co., 16 P3d 468, 471 (OklaCtApp 2000) (adopting the approach of the 10th Circuit Court of Appeals in *Timberlake*

exclusion of much of an insurer's post-filing conduct for two reasons. As the

Montana Supreme Court wrote:

> Public policy favors the exclusion of evidence of an
> insurer's post-filing litigation conduct in at least two
> respects. First, permitting such evidence is unnecessary
> because during the initial action, [circuit] courts can
> assure that defendants do not act improperly. Next, and
> more importantly, the introduction of such evidence
> hinders the right to defend and impairs access to the
> courts.

*Palmer*, 861 P2d at 914. The *Palmer* court noted that the Rules of Civil Procedure,

in most cases, provide adequate remedies for improper conduct during litigation.

*Id*.

[¶39.] Admission of otherwise proper litigation tactics as proof of bad faith

can also penalize an insurer for pursuing legitimate avenues of defense. Moreover,

impairing a party's litigation rights obstructs an attorney from zealously advocating

on behalf of his or her client's interests.

> Allowing litigation conduct to serve as evidence of bad
> faith would undermine an insurer's right to contest
> questionable claims and to defend itself against such
> claims. [P]ermitting allegations of litigation misconduct

---

*Const. Co.*, *supra*, stating "litigation conduct should rarely, if ever, be allowed
to serve as proof of bad faith"); Parsons v. Allstate Ins. Co., 165 P3d 809, 818-
19 (ColoCtApp 2006) (adopting the balancing test enunciated in *Palmer,
supra* and holding that an insurer's refusal to submit to a deposition and
filing an answer denying coverage was not admissible evidence of bad faith);
Barefield v. DPIC Cos, Inc., 600 SE2d 256, 271 (WVa 2004) (holding that an
insurer's attorney's alleged misconduct is not admissible as evidence of an
insurer's bad faith unless the insurer knowingly encourages, directs,
participates, relies upon or ratifies that behavior); *but see* Home Ins. Co. v.
Owens, 573 So2d 343, 344 (FlaDistCtApp 1990) (upholding admission of
evidence of an insurer's pleadings as well as the insurer's failure to answer a
request for admissions); Norman v. Am. Nat'l Fire Ins. Co., 555 NE2d 1087,
1110 (IllAppCt 1990) (with little discussion, court held that evidence of
insurer's conduct subsequent to denial of the claim is admissible).

would have a chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law. Insurers' counsel would be placed in an untenable position if legitimate litigation conduct could be used as evidence of bad faith.

Knotts v. Zurich Ins. Co., 197 SW3d 512, 522 (Ky 2006) (quoting *Timberlake Const. Co.*, 71 F3d at 340-41).

[¶40.]    The admission of post-filing conduct as evidence of bad faith could also impair an insurer's right of access to the courts.

'Free access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a colorable claim must be allowed to assert it without fear of suffering a penalty more severe than that typically imposed on defeated parties.'

*White*, 710 P2d at 324 (Lucas, J., concurring and dissenting) (quoting Young v. Redman, 128 CalRptr 86, 93 (CalCtApp 1976)); *see also Knotts*, 197 SW3d at 520 (citing *White*, 710 P2d at 324 (Lucas, J., concurring and dissenting)).

[¶41.]    As an evidentiary matter, many courts have questioned the probative value of an insurer's post-filing conduct as evidence of bad faith.

After the onset of litigation, an insurer begins to concentrate on supporting the decisions that led it to deny the claim. The insurer relies heavily on its attorneys using common litigation strategies and tactics to defend against a debatable claim. Consequently, actions taken after an insured files suit are at best marginally probative of the insurer's decision to deny coverage.

*Knotts*, 197 SW3d at 521 (citing Randy Papetti, Note, *Insurer's Duty of Good Faith in the Context of Litigation*, 60 Geo. Wash. L. Rev. 1931, 1972 (1992)); *see, e.g.*, *Palmer*, 861 P2d at 915; *Parsons*, 165 P3d at 817-18. "These litigation strategies and tactics will be offered up to juries who, with the benefit of hindsight, and

without the benefit of extensive exposure to litigation practices and techniques, will second guess the defendant's rationales for taking a particular course." *White*, 710 P2d at 324 (Lucas, J., concurring and dissenting). Realizing the possibility of having their litigation strategy used against them in a future bad faith suit, an insurer may be discouraged from exercising its legitimate litigation rights.

[¶42.] Consistent with the above authorities, we believe it would be a rare case where the insurer's decisions and conduct in the underlying litigation would be admissible in a first party bad faith claim. The appropriate inquiry for the circuit court in determining the relevance of such evidence is whether the insurer's post-filing conduct sheds light on the reasonableness of the insurer's decision or conduct in denying insurance benefits. The tort of first party bad faith, as alleged in the instant case, "typically occurs when an insurance company engages in wrongdoing during its processing or paying of policy benefits to its insured." *Hein*, 2007 SD 40, ¶ 10, 731 NW2d 231, 235. As noted above, the relevant inquiry for such a claim is the insurer's decision and actions "at the time it made the decision to deny coverage." *Walz*, 1996 SD 135, ¶ 8, 556 NW2d at 70. "[I]f 'the focus of a bad faith claim is the insurer's knowledge and belief during the time the claim is being reviewed' then the relevance of the litigation conduct is severely diminished." *Timberlake Const. Co.*, 71 F3d at 340.

[¶43.] In addition to the limited relevance of the type of litigation conduct proffered by DM&E, the circuit court must also carefully weigh the evidence under SDCL 19-12-3 (Rule 403). The above cases demonstrate the critical importance of a circuit court weighing the probative value of any potentially relevant litigation

evidence against the danger of unfair prejudice. In most instances, questions concerning the propriety of tactical litigation decisions by the insurer or insurer's counsel can be adequately addressed through application of the Rules of Civil Procedure, or through rules governing attorney conduct, rather than presenting the evidence to a jury as part of the tort claim.

[¶44.]     Because significant discovery remains outstanding, these evidentiary questions are remanded for the circuit court's consideration after the completion of discovery. The circuit court should apply these rules in considering the admissibility of the evidence DM&E seeks to offer.

ISSUE TWO

[¶45.]     **Whether the circuit court abused its discretion by granting DM&E's motion to compel discovery and denying Acuity's motion to quash subpoenas.**

[¶46.]     Acuity cross appeals the circuit court's discovery order requiring Attorneys Thimsen and Moore to give a deposition and produce documents in response to a subpoena duces tecum. Acuity argues that the requested discovery is protected by the attorney-client and work product privileges. DM&E argues that Acuity has waived any privilege because of its reliance upon counsel to investigate and determine the UM claim. Acuity asserts that no waiver has occurred because it has not raised an advice of counsel defense.

[¶47.]     This Court normally reviews a circuit court's discovery orders under an abuse of discretion standard. Maynard v. Heeren, 1997 SD 60, ¶ 5, 563 NW2d 830, 833 (citing Weisbeck v. Hess, 524 NW2d 363, 364 (SD 1994)). "When we are asked to determine whether the [circuit] court's order violated [a statutory privilege],

however, it raises a question of statutory interpretation requiring de novo review."

*Id.*; *see also* Delzer v. Penn, 534 NW2d 58, 61 (SD 1995).

*i. Attorney-Client Privilege*

[¶48.]     Initially we note that our review of this issue is hampered by the lack of a record showing the specific documents and communications which Acuity claims are privileged. The record shows there was a general privilege objection asserted to the requested depositions of Thimsen and Moore and the production of any documents in their possession. The objections were overruled and an order compelling the discovery was entered. The failure of a party to provide a court with sufficient information to determine the question of privilege raises substantial questions concerning the efficacy of the objection:

> As a starting point, it is clear that ultimately a party asserting privilege must make a showing to justify withholding materials if that is challenged. The question whether the materials are privileged is for the court, not the party, to decide, and the court has a right to insist on being presented with sufficient information to make that decision. It is not sufficient for the party merely to offer up the documents for in camera scrutiny by the court. Ultimately, then, a general objection cannot suffice for a decision by a court although it may suffice for a time as the parties deal with issues of privilege in discovery.

8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2016.1 (2009).

[¶49.]     Acuity failed to submit a privilege log, or offer *in camera* review to consider the privilege issue. The Court has previously stated that the preferred procedure for handling privilege issues is to allow for an *in camera* review of the documents, and court review or supervision of a deposition *in camera*. State v.

Cates, 2001 SD 99, ¶ 17, 632 NW2d 28, 35-36; *Weisbeck*, 524 NW2d at 373 (Miller, C.J., concurring in part and concurring in result in part); s*ee also Maynard*, 1997 SD 60, ¶ 28, 563 NW2d at 839-40 (Konenkamp, J., concurring in part and dissenting in part). We will review the issue here based upon the record before this Court, but future litigants asserting a privilege objection should be aware of the obligation to create a record sufficient for meaningful review of a claim of privilege.

[¶50.] The attorney-client privilege is set forth in SDCL 19-13-3.[9] As discussed above, it is unclear whether the attorney-client privilege is applicable to the entire discovery at issue. However, the parties' arguments primarily focus on whether any applicable privileges have been waived. As to Attorney Moore, there appears to be no dispute between the parties that the requested discovery is privileged, so we address the waiver issue as to him.

---

9.  "A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

    (1) Between himself or his representative and his lawyer or his lawyer's representative;

    (2) Between his lawyer and the lawyer's representative;

    (3) By him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein;

    (4) Between representatives of the client or between the client and a representative of the client; or

    (5) Among lawyers and their representatives representing the same client."

[¶51.] The attorney-client privilege is personal to the client and may only be waived by the client, or through his attorney. State v. Catch the Bear, 352 NW2d 640, 645 (SD 1984). The party asserting a claim of waiver has the burden of establishing a waiver of a privilege. *Id.* at 647 (citing Hogue v. Massa, 80 SD 319, 123 NW2d 131 (1963)). To invoke a waiver the record must "demonstrate that [the client] impliedly or explicitly consented to his attorney waiving the attorney-client privilege on his behalf." State v. Rickabaugh, 361 NW2d 623, 625 (SD 1985).

[¶52.] DM&E asserts that Moore should be required to produce discovery and give a deposition concerning his representation of the manufacturer of the Hy-Rail system. Although Moore and Thimsen are partners, they represented different clients. There is no showing that the Hy-Rail manufacturer has taken any action to expressly or impliedly waive its privilege as to Moore. Further, there is no showing that Moore had any personal involvement in representing Acuity or has information for which a waiver of the privilege, if any, by Acuity would apply.

[¶53.] Based upon this undisputed record, there is no showing of any waiver of the privilege as to Moore's client. Accordingly, the circuit court's discovery order relating to Moore would violate his responsibility to hold his client's communications in confidence. Moore cannot be required to produce this discovery and the circuit court erred by compelling the deposition and discovery requests as to Moore.

[¶54.] As to the discovery requested of Thimsen, both parties cite *Kaarup v. St. Paul Fire & Marine Insurance Co.*, 436 NW2d 17 (SD 1989). DM&E argues that Acuity has waived any applicable privilege under *Kaarup* because it relies upon

advice of counsel. Acuity argues that *Kaarup* is inapplicable because it has not asserted an advice of counsel defense. *Kaarup* held that the attorney-client privilege is impliedly waived to the extent that a party asserts advice of counsel as an essential element of its defense. *Id.* at 21. *Kaarup* limited the extent of the waiver stating:

> We do not believe, as some courts have held, that the defense of advice of counsel waives the attorney/client privilege with respect to all communication between client and counsel concerning the transaction for which counsel's advice was sought. We find that the attorney/client privilege is waived only to the extent necessary to reveal the advice given by an attorney that is placed in issue by the defense of advice of counsel.

*Id.* (internal citation omitted).

[¶55.]    Several courts hold that the attorney-client privilege does not apply where the attorney acted as a claims adjustor on the initial claim determination because the attorney is not acting as a lawyer in such instance. First Aviation Servs., Inc. v. Gulf Ins. Co., 205 FRD 65, 68-69 (DConn 2001); Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 152 FRD 132, 137 (NDIll 1993); Mission Nat'l Ins. Co. v. Lilly, 112 FRD 160, 163 (DMinn 1986); Evans v. United Servs. Auto. Ass'n., 541 SE2d 782, 791 (NCCtApp 2001). In *Lilly,* the insurer immediately hired a law firm upon receipt of a notice of a fire "to fulfill its ordinary business function of claims investigation." *Id.* at 163. The *Lilly* court held under such facts that:

> It would not be fair to allow the insurer's decision in this regard to create a blanket obstruction to discovery of its claims investigation. To the extent that Cozen & O'Connor acted as claims adjusters, then, their work-product, communications to client, and impressions about the facts will be treated herein as the ordinary business of plaintiff, outside the scope of the asserted privileges.

*Id.*

[¶56.]     In this case, Behrend testified that outside counsel *exclusively* conducted the investigation and *solely* made the initial determination to deny the UM claim. The evidence suggests that Acuity completely delegated its claims function to outside counsel (Thimsen). Under such facts, we believe the above rule is applicable. Accordingly, we hold that where an insurer unequivocally delegates its initial claims function and relies e*xclusively* upon outside counsel to conduct the investigation and determination of coverage, the attorney-client privilege does not protect such communications.[10]

[¶57.]     We have found no contrary authority under facts as they exist in this case. Further, this holding is consistent with our legislature's codification of the attorney-client privilege, which is "in accord with modern authorities which hold that privileges created by statute are to be strictly construed to avoid suppressing otherwise competent evidence." *Catch the Bear*, 352 NW2d at 646-47 (citations omitted). A contrary holding would permit an insurer to insulate its claims handling process from any disclosure or review by simply delegating the claims

---

10.   Some courts have required bifurcation of the bad faith claim and reserved discovery until the plaintiff has first established coverage on the underlying claim. *See* Bartlett v. John Hancock Mut. Life Ins. Co., 538 A2d 997, 1000-01 (RI 1988), abrogated on other grounds in *Skaling*, 799 A2d 997; Allstate Ins. Co. v. Swanson, 506 So2d 497, 498 (FlaDistCtApp 1987); *In re* Bergeson, 112 FRD 692, 697 (DMont 1986). Since the parties agreed to bifurcation in this case it is unnecessary to address this issue.

process to its attorneys and asserting privilege.

## ii. Work Product Privilege

[¶58.]    The above holding is equally applicable to the work product privilege. This holding does not address the question of whether such material may still be ordinary work product; and, on this record, we are unable to determine to what extent the requested discovery was prepared in anticipation of litigation. Accordingly, we remand the case to the circuit court to determine the extent of any work product claims as to the requested discovery of Thimsen.

[¶59.]    Our holding does not address the attorney-client privilege applicable to Thimsen's role as defense counsel for Acuity, or the communications subject to this privilege. On remand, the circuit court will need to determine the question of attorney-client privilege and work product privilege based upon Thimsen's dual capacities of claims adjustor and defense counsel for Acuity. The court should then consider the questions of waiver of any applicable privilege.

## CONCLUSION

[¶60.]    The court's order entering summary judgment is reversed and the claims are remanded to the circuit court. On Acuity's cross appeal, we reverse the circuit court's discovery order as to Moore. We affirm the circuit court's discovery order as to Thimsen to the extent it is consistent with this Court's holding. We remand this latter issue for the circuit court to make the determinations set forth in this opinion.

#24892, 24904

[¶61.]    GILBERTSON, Chief Justice, MEIERHENRY, Justice, SABERS, Retired Justice, and TRANDAHL, Circuit Judge, concur.

[¶62.]    JENSEN, Circuit Judge, for KONENKAMP, Justice, disqualified.

[¶63.]    TRANDAHL, Circuit Judge, for ZINTER, Justice, disqualified.