#30841-a-SPM
**2025 S.D. 60**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MARK FIECHTNER,                                    Plaintiff and Appellee,

    v.

AMERICAN WEST INSURANCE
COMPANY,                                           Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOHN R. PEKAS
Judge

\* \* \* \*

MARK J. ARNDT
DELIA M. DRULEY of
Evans, Haigh & Arndt, LLP
Sioux Falls, South Dakota

                                 Attorneys for defendant and
                                 appellant.


SEAMUS W. CULHANE
NANCY J. TURBAK BERRY of
Turbak Law Office, P.C.
Watertown, South Dakota

                                 Attorneys for plaintiff and
                                 appellee.

\* \* \* \*

                                 ARGUED
                                 JUNE 3, 2025
                                 OPINION FILED **11/05/25**

#30841

MYREN, Justice

[¶1.] Mark Fiechtner was in a motor vehicle accident in April 2018. Following the accident, Fiechtner sought medical treatment for neck pain, vision issues, and problems with his memory. Fiechtner made a claim for payment of medical benefits to his insurer, American West Insurance Company (American West), which paid the limits of medical benefits coverage under his policy. Fiechtner also made a claim with the underlying tortfeasor's insurer and was paid the full extent of their liability coverage. Fiechtner then claimed underinsured motorist benefits (UIM) pursuant to his policy with American West. After American West offered Fiechtner an amount substantially less than what he demanded, he filed suit against American West for breach of contract and bad faith, and requested punitive damages and attorney fees. The jury found for Fiechtner on all counts, and the circuit court granted Fiechtner's request for attorney fees. American West appeals. We affirm.

## Factual and Procedural Background

[¶2.] Fiechtner was involved in a motor vehicle accident on April 14, 2018, in Lincoln County, South Dakota. The driving conditions were poor that day because the roads were covered with snow and ice. Fiechtner was driving a large pickup truck. As Fiechtner approached an intersection, he had a green light and proceeded to travel through the intersection at approximately 40 miles per hour.

[¶3.] Caitlyn Belliveau was driving a sedan and was traveling perpendicular to Fiechtner. As Belliveau approached the intersection, she attempted to slow her vehicle, but it slid into the cross-traffic and collided with Fiechtner's vehicle.

Throughout the proceedings, there was no dispute that Belliveau was at fault for causing the accident. Law enforcement's accident report indicated that Fiechtner did not report any injuries at the scene of the accident and that the airbags in his vehicle did not deploy.

[¶4.] Fiechtner had an insurance policy with American West with medical benefits limits of $10,000 and UIM coverage limits of $1,000,000. Fiechtner notified American West of the accident a few days after it occurred. Belliveau had an insurance policy through IMT Insurance with liability limits of $100,000.

[¶5.] Three days after the accident, Fiechtner noticed pain in the back of his head and throughout his neck. He also began to have frequent headaches, low energy, soreness, muscle spasms, and issues with his vision and memory. He sought treatment from a chiropractor for about a month, but his symptoms persisted, so the chiropractor referred him to an orthopedic surgeon.

[¶6.] The orthopedic surgeon's initial record indicates that Fiechtner's reported symptoms "could represent Whiplash injury and possibly even concussive type symptoms with his vision changes, headaches." The orthopedic surgeon recommended a cervical spine MRI followed by physical therapy. Fiechtner received trigger point injections in his neck to manage his pain. The MRI showed "[m]ild cervical degenerative disc disease with very mild bulging without spinal stenosis or spinal cord compression." The orthopedic surgeon noted there was "[n]o evidence of any neurologic deficit other than possibility of closed head trauma with the possibility of a head concussion and also blurry vision." The orthopedic surgeon

was "very concerned" about Fiechtner's blurry vision and referred him to an ophthalmologist and a concussion specialist.

[¶7.] Fiechtner met with an ophthalmologist and reported "double vision up close, headaches, fluctuating vision, eye strain, eye fatigue, difficulty with reading and other near visual tasks." The ophthalmologist diagnosed Fiechtner with convergence insufficiency and began him on a regimen of vision therapy and follow-up appointments. Fiechtner attended several appointments with the ophthalmologist and completed at-home therapy. Despite these efforts, Fiechtner testified at trial that his vision issues had not significantly improved.

[¶8.] Fiechtner submitted a claim to American West pursuant to the medical benefits provision of his insurance policy on April 25, 2018. American West assigned the claim to claims adjustor Mary Jo Dahl. Dahl personally communicated with Fiechtner on several occasions, received a release to obtain Fiechtner's medical records and bills for his accident-related treatment, reviewed these records and bills, and communicated with Fiechtner's treating healthcare providers about the nature of Fiechtner's injuries and whether they were related to the accident. As part of her investigation, Dahl received a communication from Fiechtner's ophthalmologist that "he believes visual deficits that Mark Fiechtner is experiencing can occur after a head injury and that convergence insufficiency is one of the most common findings that they see after a head injury." Dahl documented each of her interactions with Fiechtner and his healthcare providers.

[¶9.] By late September 2018, Fiechtner had exhausted the $10,000 in medical benefits coverage pursuant to his policy with American West. Despite

exhausting the limits of his medical benefits coverage, Fiechtner continued to seek treatment for his symptoms.

[¶10.]     In July 2019, Fiechtner sent a letter to Belliveau's insurance carrier that detailed the nature of his injuries and the treatment he had received, and it assessed how these injuries would potentially impact his life.  Fiechtner demanded that Belliveau's insurance carrier pay the limits of Belliveau's liability coverage ($100,000).  Belliveau's insurance carrier accepted liability and offered Fiechtner the full extent of Belliveau's liability coverage.

[¶11.]     Fiechtner's counsel notified American West that Belliveau's insurance carrier had offered him the full limits of her policy and requested that it allow him to accept the settlement.  American West granted permission for Fiechtner to accept payment from Belliveau's insurance carrier.  Fiechtner then made a claim to American West for $900,000 in UIM benefits.

[¶12.]     Chris Oen, the vice president of claims for American West, assigned claims adjuster Abby Kramer to handle Fiechtner's UIM claim.  Fiechtner's counsel submitted Fiechtner's medical records and other documents to assist Kramer in her investigation of Fiechtner's UIM claim.

[¶13.]     Kramer's investigation of Fiechtner's UIM claim was limited to the documentation that Fiechtner's counsel had submitted.  Kramer did not ask Fiechtner's counsel for permission to speak with Fiechtner about his injuries, did not seek a release to talk to Fiechtner's healthcare providers or obtain additional documentation, and did not review American West's claim notes related to Fiechtner's claim for medical benefits.  Regarding Fiechtner's injuries, Kramer

concluded, "It is certainly questionable if continuous neck pain, memory issues, and visual disturbances are a direct result from this accident as all could be degenerative/result of getting older." Regarding the value of Fiechtner's UIM claim, Kramer believed that Fiechtner had already been made whole, considering American West's payment of $10,000 in medical benefits and Belliveau's insurance carrier's payment of $100,000. Nevertheless, Kramer and Oen agreed that an additional $10,000 would fairly represent the value of Fiechtner's UIM claim.

[¶14.] After Kramer presented the $10,000 UIM offer via email, Fiechtner's counsel inquired, "What is this offer based upon?" Kramer responded, "This offer was based on: facts of loss, police report, impacts to both vehicles, bills and records for his treatment, diagnosed injuries, and impact to life." Fiechtner again inquired, "Sure, I can imagine that those things were included, but how did you arrive at this number?" Kramer responded, "This offer was based on experience and a review with my manager. To be honest, I believe [Fiechtner] was fully compensated by the underlying carrier's $100,000 settlement and our waiver of subrogation right for the $10,000 med pay." Fiechtner's counsel responded that Fiechtner had what appeared to be a serious brain injury, that the $10,000 offer was unreasonable considering that injury, and threatened to file a lawsuit if American West did not offer more money. To that, Kramer explained, "At this point, we are too far apart in our evaluation. You can file suit if you feel you must."

[¶15.] Fiechtner filed his complaint against American West in November 2019. The complaint alleged: (1) breach of contract; (2) statutory entitlement to attorney fees pursuant to SDCL 58-12-3; and (3) breach of the duty of good faith and

fair dealing (bad faith).  In addition to requesting damages based on those counts, Fiechtner also requested punitive damages.

[¶16.]     Fiechtner retained Dr. Ammar Chaudry as an expert.  Dr. Chaudry, a neuroradiologist based in Los Angeles, reviewed the results of Fiechtner's post-accident MRI to assess whether he had suffered a brain injury.  Dr. Chaudry concluded in his report that Fiechtner's reported conditions were "most consistent with traumatic brain injury."  During his deposition, Dr. Chaudry noted that Fiechtner had been involved in a T-bone-type accident and reiterated that he had suffered a traumatic brain injury.  He prepared a slideshow presentation that contained depictions of how brain injuries can occur in an accident like Fiechtner's. Over objections from American West, he utilized the slideshow presentation to explain his conclusions.

[¶17.]     A jury trial was held on April 9–12, 2024.  As part of his case-in-chief, Fiechtner called Oen as a witness.  Oen admitted that Dahl (American West's medical benefit claims adjustor) contacted Fiechtner's healthcare providers and that Kramer (American West's UIM claim adjustor) did not.  Oen explained that as a general practice, American West's UIM claims adjustors do not reach out to treating healthcare providers when investigating claims and that an independent medical examiner was not retained during Kramer's investigation of Fiechtner's UIM claim. Oen also explained that American West does not allow their UIM adjustors to access the claim notes entered by their medical benefit claim adjustors.  He also admitted that Kramer only reviewed the documentation submitted by Fiechtner's

counsel. Further, Oen explained that, based on the claim notes, it appeared as if Dahl and Kramer had "differing opinions."

[¶18.]   During Oen's testimony, Fiechtner's counsel published a document that the parties have denominated the "claims dollar exhibit." As depicted below, this document consists of a picture of a dollar bill with writing over the top that generally describes how insurance companies process premium payments.



[¶19.]   When the claims dollar exhibit was initially published, American West objected. It noted that the exhibit had not been admitted into evidence and argued that its existence was not disclosed during discovery. Fiechtner responded that he intended to use the exhibit in connection with Oen's testimony to aid the jury in understanding how insurance companies process premium payments. The circuit court instructed Fiechtner's counsel to lay a proper foundation for the information in the exhibit and then to offer it before publishing it to the jury. Thereafter, Fiechtner questioned Oen about the intricacies of the insurance business and moved to admit the claims dollar exhibit. American West objected again. The circuit court

overruled American West's objection and admitted it as a demonstrative exhibit. Fiechtner also elicited testimony from Oen that the bonus structure at American West essentially rewards adjustors who pay out less in claims.

[¶20.]    Fiechtner also called Kramer as a witness during his case-in-chief. Kramer explained that she handles 350 to 400 claims in any given year, of which about 20 to 30 are UIM claims. She admitted that she has no formal medical training and no training related to brain injuries. Kramer testified that she knew that Dahl had handled the medical benefits claim for American West and admitted that she had not reviewed the file notes or documents related to that claim. Kramer admitted her investigation in this case consisted entirely of a review of the records submitted by Fiechtner and a search of Fiechtner's social media. She admitted she did not contact Fiechtner's counsel requesting the ability to speak with Fiechtner about his injuries, that she never requested a release to talk to Fiechtner's healthcare providers or obtain additional medical documentation, and that she did not know there was a note in the claim file entered by Dahl that suggested that Fiechtner's vision issues could be attributable to a head injury.

[¶21.]    Fiechtner was unable to secure Dr. Chaudry's attendance at trial, so he offered a video recording of his deposition testimony. American West objected on the basis that there was insufficient foundation for the slideshow presentation that was used during Dr. Chaudry's deposition testimony and that the slideshow presentation was not disclosed as a potential exhibit prior to trial. The circuit court overruled American West's objections, and Dr. Chaudry's video-recorded deposition testimony was played for the jury.

[¶22.]    At the close of Fiechtner's case, American West moved for judgment as a matter of law on Fiechtner's bad faith claim. American West argued the value of Fiechtner's UIM claim was fairly debatable, and as such, it did not act in bad faith when it denied Fiechtner's UIM claim. American West also argued that Fiechtner presented no evidence that it engaged in any conscious wrongdoing when it denied Fiechtner's UIM claim.

[¶23.]    Fiechtner responded and argued that his bad faith claim was premised on the nature of American West's investigation of his UIM claim. Fiechtner pointed to the fact that Kramer had no medical background and admitted that she had no training regarding the intricacies of brain injuries. Additionally, Fiechtner noted that Kramer never attempted to reach out to him personally, she never tried to reach out to Fiechtner's treating healthcare providers, and she never reviewed American West's claim notes relating to the medical benefits claim. Fiechtner argued American West "intentionally segregate[s] their earlier investigation so unaware UIM adjustors can overlook [those prior investigations] and be genuinely ignorant of the causation that's already proven."

[¶24.]    The circuit court denied American West's motion. The circuit court began by explaining that it had to view the evidence in the light most favorable to Fiechtner. It then reasoned that, based on the evidence, a jury could conclude American West's investigation was inadequate or that American West failed to reasonably communicate to Fiechtner why it offered $10,000 in UIM benefits.

[¶25.]    After American West finished presenting evidence, the circuit court heard argument about whether Fiechtner's punitive damages request should be

submitted for the jury's consideration. American West argued that Fiechtner had failed to demonstrate any "willful, wanton, or malicious conduct on the part of American West" under SDCL 21-1-4.1. American West also argued that the facts of the case were not such that the jury could conclude there was evidence of ill-will sufficient to meet the standard of implied malice. The circuit court allowed the jury to consider punitive damages after concluding that, based on the evidence presented, there was a reasonable basis to believe that there had been willful, wanton, or malicious conduct on the part of American West.

[¶26.] The jury rendered a verdict in favor of Fiechtner on all counts. The jury found that American West breached its insurance contract with Fiechtner and awarded $400,000 in damages for that count, representing the value of Fiechtner's UIM claim. The jury determined the date the UIM claim should have been paid was October 23, 2019. The circuit court later included $189,369.86 in prejudgment interest relating to breach of contract damages. The jury found that American West breached its duty of good faith and fair dealing and awarded $250,000 in damages for that count. Finally, the jury found that punitive damages were appropriate and awarded $890,000 in such damages.

[¶27.] After the jury rendered its verdict, American West orally renewed its motion for judgment as a matter of law. American West later filed a written renewed motion for judgment as a matter of law and an alternative motion for a new trial. After the parties submitted their briefing related to American West's motion, the circuit court denied it.

[¶28.]    Fiechtner filed an affidavit requesting statutory attorney fees pursuant to SDCL 58-12-3. Attached to the affidavit was a log of the time spent working on the case and the representation agreement with Fiechtner. Fiechtner's counsel requested $196,632.97 in statutory attorney fees and $12,191.24 in sales tax for those fees. The circuit court awarded $96,045 in statutory attorney fees and sales tax of $5,954.79 on the fees.

[¶29.]    American West appeals, raising the following issues for this Court's review:

> 1.  Whether the circuit court erred when it denied American West's motion for judgment as a matter of law.
>
> 2.  Whether the circuit court clearly erred when it found American West's refusal of Fiechtner's UIM claim was vexatious or without reasonable cause when assessing attorney fees under SDCL 58-12-3.
>
> 3.  Whether the circuit court abused its discretion regarding evidentiary issues.

**Decision**

*1.    Whether the circuit court erred when it denied American West's motion for judgment as a matter of law.*

[¶30.]    American West argues the circuit court erred when it denied its renewed motion for judgment as a matter of law related to the jury's bad faith finding and its award of punitive damages. Regarding Fiechtner's bad faith claim, American West argues that "Fiechtner did not present evidence of American West's conscious wrongdoing, which is a necessary element of a bad faith claim." American West submits that the value of Fiechtner's UIM claim was and is fairly debatable. To support this argument, American West points to the fact that the jury awarded

$400,000 for Fiechtner's breach of contract claim, which is the approximate midpoint between the parties' respective pre-litigation valuations of Fiechtner's UIM claim. American West also argues that determining the value of UIM claims is inherently subjective, making them fairly debatable.

[¶31.]     With regard to the jury's award of punitive damages, American West asserted: "There was a lack of evidence at trial of American West's malice." It argued that there needed to be evidence that it engaged in "willful, wanton, or malicious conduct" when it denied Fiechtner's UIM claim before a jury could consider or award punitive damages. American West alternatively requested a new trial on punitive damages pursuant to SDCL 15-6-59(a)(5) (excessive damages) and SDCL 15-6-59(a)(6) (insufficiency of the evidence to justify the verdict).

[¶32.]     Under SDCL 15-6-50(a), after "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

[¶33.]     Under SDCL 15-6-50(b), if "the court does not grant a motion for judgment as a matter of law at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than ten days after notice of entry of judgment[.]" "If a verdict was returned[,]" the circuit court may, "(A) Allow

the judgment to stand; (B) Order a new trial; or (C) Direct entry of judgment as a matter of law[.]" *Id.*

[¶34.] "This Court reviews a circuit court's grant or denial of a motion for judgment as a matter of law de novo." *In re Estate of Tank*, 2023 S.D. 59, ¶ 38, 998 N.W.2d 109, 122 (citing *Ctr. of Life Church v. Nelson*, 2018 S.D. 42, ¶ 18, 913 N.W.2d 105, 110). Under the de novo standard of review, "we give no deference to the circuit court's decision." *Id.* (citation omitted).

[¶35.] In assessing whether the circuit court's grant or denial of a motion for judgment as a matter of law was proper, this Court applies the same standard as the circuit court. *Id.* ¶ 39, 998 N.W.2d at 122. "[W]e view the evidence in the light most favorable to the verdict or to the nonmoving party. Then '[w]ithout weighing the evidence, the court must . . . decide if there is evidence that supports [the] verdict.'" *Id.* (second and third alterations in original) (quoting *Ctr. of Life Church*, 2018 S.D. 42, ¶ 18, 913 N.W.2d at 110). "If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate." *Weiland v. Bumann*, 2025 S.D. 9, ¶ 37, 18 N.W.3d 148, 158 (citation omitted).

[¶36.] "In our review of the sufficiency of the evidence supporting a jury verdict, 'we are not to speculate or query how we would have viewed the evidence and testimony, or what verdict we would have rendered had we been the jury.'" *Tank*, 2023 S.D. 59, ¶ 39, 998 N.W.2d at 122 (quoting *Wright v. Temple*, 2021 S.D. 15, ¶ 28, 956 N.W.2d 436, 446). "Rather it is the jury's responsibility, as the ultimate trier of fact, to 'weigh the conflicting evidence or decide upon the credibility of the witnesses.'" *Id.* (citation omitted). "[A] jury's verdict should be affirmed if it

can be explained with reference to the evidence, 'rather than passion, prejudice, or mistake of law.'" *Id.* (citation omitted).

### a.    Bad Faith

[¶37.]    "First-party bad faith . . . is an intentional tort and typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." *Hein v. Acuity*, 2007 S.D. 40, ¶ 10, 731 N.W.2d 231, 235 (citation omitted). "In [bad faith] cases, the [insurer and the insured] are adversaries, and therefore, an insurer is permitted to challenge claims that are fairly debatable. However, a frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith." *Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 13, 915 N.W.2d 697, 701 (alterations in original) (quoting *Hein*, 2007 S.D. 40, ¶ 10, 731 N.W.2d at 235). At its core, a first-party bad faith claim is about an insurer's failure to fulfill its obligations to the insured under its insurance contract.

[¶38.]    "In order to be successful on a claim of bad faith, a plaintiff must prove: '(1) an absence of a reasonable basis for denial of policy benefits, and (2) the insurer's knowledge of the lack of a reasonable basis for denial.'" *Id.* (quoting *Mordhorst v. Dakota Truck Underwriters & Risk Admin. Servs.*, 2016 S.D. 70, ¶ 9, 886 N.W.2d 322, 324). "When evaluating whether an insurer has engaged in bad faith, we must look to 'the facts and law available to [the] [i]nsurer at the time it made the decision to deny coverage.'" *Bertelsen v. Allstate Ins. Co.*, 2013 S.D. 44, ¶ 17, 833 N.W.2d 545, 554 ("*Bertelsen III*") (alterations in original) (citation

omitted), *abrogated on other grounds by*, *Magner v. Brinkman*, 2016 S.D. 50, 883 N.W.2d 74.

[¶39.]     "Bad faith conduct may include the failure to conduct a reasonable investigation concerning the claim." *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 2009 S.D. 69, ¶ 19, 771 N.W.2d 623, 629 (citing *Walz v. Fireman's Fund Ins. Co.*, 1996 S.D. 135, ¶ 8, 556 N.W.2d 68, 70).  For a bad faith claim premised on an insurer's inadequate investigation of a claim to succeed, there must be some causation between the insurer's inadequate investigation and its denial of the insured's claim.  "The question of whether an insurer has acted in bad faith is generally a question of fact." *Id.* ¶ 19, 771 N.W.2d at 629–30.

[¶40.]     During her investigation of Fiechtner's UIM claim, Kramer prepared an eight-page evaluation.  This evaluation was admitted into evidence at the trial and describes Fiechtner's insurance coverage with American West and his claim history.  It also provides a condensed summary of the medical records that Fiechtner's counsel submitted with his request for UIM benefits.

[¶41.]     When American West offered Fiechtner $10,000 in UIM benefits, Fiechtner's counsel inquired what the offer was based on and how American West arrived at that number.  Kramer did not send Fiechtner the eight-page summary she had prepared documenting her assessment of Fiechtner's UIM claim.  Instead, she stated that the offer was based on the "facts of loss, police report, impacts to both vehicles, bills and records for his treatment, diagnosed injuries, and impact to life."  Kramer explained that she believed that Fiechtner had already been made

whole, considering American West's payment of $10,000 in medical benefits and Belliveau's insurance carrier's payment of $100,000.

[¶42.]     In his complaint, Fiechtner premised his bad faith claim on American West's alleged "failure to reasonably investigate the claim; failure to reasonably evaluate the claim; failure to give due weight to the insured's interests; failure to pay the full amount of benefits due; and failure to provide a reasonable explanation for denial of [Fiechtner's] claim for additional benefits due."

[¶43.]     Fiechtner obtained American West's claim notes relating to Fiechtner's claim for both medical and UIM benefits. The claim notes were received into evidence at trial. Viewing these claim notes in the light most favorable to the verdict, they establish a significant discrepancy in how American West investigated and handled Fiechtner's claim for medical benefits as opposed to UIM benefits. While investigating Fiechtner's medical benefits claim on American West's behalf, Dahl contacted Fiechtner on several occasions inquiring about the status of his injuries, obtained releases to secure medical records for Fiechtner's post-accident treatment, and communicated with Fiechtner's treating healthcare providers about the nature of his injuries. Conversely, the claims notes establish that Kramer's investigation of Fiechtner's UIM claim consisted entirely of a review of the medical records that Fiechtner's counsel submitted and a search of Fiechtner's social media accounts.

[¶44.]     At the trial, Kramer admitted she had not received any formal medical training, that she did not seek the assistance of an independent medical evaluator, and that she did not consult with Fiechtner or any of his treating healthcare

providers.[1] She testified that she was aware Dahl had handled Fiechtner's medical benefits claim but admitted that she did not review Dahl's notes or consult with her about her investigation. She testified that UIM adjustors are prohibited from reviewing claim notes created by medical claims adjusters. A review of these notes would have revealed the extent of Dahl's investigation and conclusions related to Fiechtner's claim for medical benefits. Kramer explained at trial that the basis of her $10,000 offer was "what our insured and his counsel would have provided to us that, if you felt we needed something else, you would have provided something else." The jury could have reasonably concluded that Fiechtner's reported injury required a more thorough investigation.

[¶45.]     American West argues that the value of Fiechtner's UIM claim was fairly debatable because the jury awarded $400,000 in breach of contract damages, which represents the approximate midpoint of the parties' pre-litigation valuations of Fiechtner's UIM claim ($10,000 and $890,000). This argument is misplaced

---

1.     The jury also heard testimony from Fiechtner's treating healthcare providers about their willingness to cooperate with insurance adjustors. Dr. Ryan Otto, one of Fiechtner's physical therapists, testified that he treated Fiechtner's "cervical spine due to neck pain and headaches." Dr. Otto testified that, throughout his career, he has received correspondence from claims adjustors who work for insurance companies and that he communicates with them when they reach out. Dr. K.C. Chang, a medical doctor who specializes in "physical medicine rehab," performed trigger point injections in Fiechtner's neck to alleviate his pain. Dr. Chang testified that Fiechtner came to him with reports of "whiplash-type injury to the neck." Dr. Chang confirmed that he cooperates whenever a claims adjustor reaches out to him for information relating to the care he provides. Dr. Jeff Oakland, an optometrist, treated Fiechtner's vision issues, diagnosed Fiechtner with convergence insufficiency, and recommended that Fiechtner complete a regimen of vision therapy. Dr. Oakland testified that he cooperated with Dahl's investigation on American West's behalf.

because we assess whether an insurer denied a claim in good faith based on the facts available to the insurer at the time that decision was made. *See Bertelsen III*, 2013 S.D. 44, ¶ 17, 833 N.W.2d at 554. American West did not know what the jury would award at the time it made its coverage decision. Consequently, that information did not inform American West's coverage decision. Moreover, under American West's theory, any time a jury awards damages between the amount the insured requested and the amount the insurer offered, the insurer's offer would be deemed to be made in good faith regardless of the reasonableness of the insurer's basis for denying the claim. This is inconsistent with our prior decisional law. Even if American West believed that Fiechtner overvalued his UIM claim, it still had a duty to investigate Fiechtner's claim in good faith.

[¶46.] Similarly, American West's claim that the subjective nature of the value of UIM claims renders them all to be fairly debatable is inconsistent with our decisional law. While the value of UIM claims may be debatable, that does not mean they are all *fairly* debatable, particularly when an insurer's investigation was inadequate. American West also points to Kramer's eight-page UIM evaluation as a means of establishing its good faith while investigating Fiechtner's claim. The jury received and considered the eight-page evaluation before rendering its verdict. This Court defers to the jury on issues of the weight of the evidence when reviewing a renewed motion for judgment as a matter of law. *Tank*, 2023 S.D. 59, ¶ 39, 998 N.W.2d at 122 (quoting *Wright*, 2021 S.D. 15, ¶ 28, 956 N.W.2d at 446).

[¶47.] The evidence presented to the jury regarding American West's handling of Fiechtner's claims supports the jury's verdict when that evidence is

viewed in the light most favorable to the verdict. The jury heard testimony about the thoroughness of Dahl's investigation of Fiechtner's medical benefits claim. The jury also heard testimony that Kramer's investigation of Fiechtner's UIM claim did not extend beyond a review of the records supplied by Fiechtner and a review of Fiechtner's social media accounts. The jury heard testimony that Kramer did not review the notes from Dahl's thorough investigation because American West UIM adjustors are prohibited from reviewing claim notes entered by other adjustors. The jury also heard Kramer testify that she had not received medical training and that when she had questions about the terminology used in medical records, she "looked it up" rather than consulting with an independent medical examiner. Additionally, the jury heard Kramer admit that she never tried to talk to Fiechtner to discuss the nature of his injuries.

[¶48.] The jury could have reasonably concluded that American West did not have a reasonable basis to deny Fiechtner's claim and that it was aware that it lacked a reasonable basis to deny the claim. Accordingly, the circuit court did not err when it denied American West's renewed motion for judgment as a matter of law under Rule 50(b).

### b.    *Punitive Damages*

[¶49.] American West argues the jury's award of punitive damages should be set aside "[f]or the same reasons that the jury's [v]erdict awarding damages for bad faith should be set aside[.]" American West contends the circuit court erred in submitting punitive damages to the jury because there was no evidence presented at trial that it acted with malice when it denied Fiechtner's UIM claim. American

West alternatively requests a new trial on punitive damages on the ground that the jury's award of $890,000 in punitive damages was excessive.

[¶50.] "The trial court's determination that there was a reasonable basis to submit the issue of punitive damages to the jury will not be disturbed absent a showing that the trial court's findings of fact are clearly erroneous." *Bertelsen v. Allstate Ins. Co.*, 2011 S.D. 13, ¶ 38, 796 N.W.2d 685, 698 ("*Bertelsen II*") (quoting *Harter v. Plains Ins. Co.*, 1998 S.D. 59, ¶ 36, 579 N.W.2d 625, 634). Under the clearly erroneous standard, this Court will reverse only if it is "left with a definite and firm conviction that a mistake has been committed." *In re Estate of Gustafson*, 2007 S.D. 46, ¶ 7, 731 N.W.2d 922, 925 (citation omitted).

[¶51.] "Whether a request for punitive damages may be submitted to a jury is governed by SDCL 21-1-4.1[.]" *Wright*, 2021 S.D. 15, ¶ 55, 956 N.W.2d at 454. Pursuant to that statute:

> In any claim alleging punitive damages or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

SDCL 21-1-4.1. "In applying this statute, we have explained that '[t]he proponent [of a punitive damages claim] bears a burden of demonstrating a "reasonable basis" to believe punitive damages are warranted.'" *Wright*, 2021 S.D. 15, ¶ 55, 956 N.W.2d at 454 (alterations in original) (quoting *Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419, 425 (S.D. 1994)). "This statute merely requires clear and convincing evidence to show a *reasonable basis*." *Sells v. Tozser*, 2010 S.D. 64, ¶ 29,

786 N.W.2d 748, 757 (citation omitted). "Thus, it 'is a preliminary, lower-order quantum of proof than must be established at trial.'" *Id.* (citation omitted).

[¶52.] "Malice is an essential element of a punitive damages claim[.]" *Bertelsen II*, 2011 S.D. 13, ¶ 39, 796 N.W.2d at 698 (citing SDCL 21-3-2). Malice "may be actual or presumed." *Id.* ¶ 40, 796 N.W.2d at 699 (citing *Biegler v. Am. Fam. Ins. Co.*, 2001 S.D. 13, ¶ 45, 621 N.W.2d 592, 605). "Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill-will towards that person." *Id.* (quoting *Biegler*, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605). Presumed malice is "'malice which the law infers from or imputes to certain acts.'" *Id.* (quoting *Harter*, 1998 S.D. 59, ¶ 36, 579 N.W.2d at 634). "Presumed malice may not 'be motivated by hatred or ill-will but is present when a person acts willfully or wantonly to the injury of others.'" *Id.* (quoting *Biegler*, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605). "An insurer's clear breach of contract or denial of a claim that is not fairly debatable may indicate malice." *Id.* ¶ 41.

[¶53.] The facts upon which the circuit court found there was a reasonable basis to submit the issue of punitive damages for the jury's consideration are the same facts underlying its denial of American West's motion for judgment as a matter of law. The circuit court began its analysis of the punitive damages issue by noting the apparent disparity between Dahl's investigation of Fiechtner's medical benefits claim and Kramer's investigation of Fiechtner's UIM claim. This was confirmed by American West's claim notes and Kramer's testimony. Furthermore, the circuit court explained, "Kramer didn't reach out to any of the treating

physicians." During her testimony, Kramer confirmed this was true. The circuit court also considered the bonus structure at American West, which had the effect of rewarding claims adjustors who paid less in coverage. Chris Oen confirmed that this was the case during his testimony.

[¶54.] Each of the facts discussed by the circuit court when it found a reasonable basis to submit the issue of punitive damages to the jury is supported by evidence in the record and by the testimony presented at trial. "Considering the evidence as a whole, a jury could have found that [American West] acted 'willfully or wantonly to the injury of [Fiechtner]' and 'demonstrat[ed] a disregard for the rights of others.'" *Selle*, 2010 S.D. 64, ¶ 32, 786 N.W.2d at 758 (third alteration in original) (citation omitted). Because evidence of presumed malice is sufficient to support punitive damages, the circuit court was not clearly erroneous in finding a reasonable basis for submitting Fiechtner's punitive damages claim to the jury.

[¶55.] American West also argues that the jury's award of $890,000 in punitive damages is so excessive as to warrant a new trial on those kinds of damages. "The circuit court may grant a new trial if it finds '[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice [or] [i]nsufficien[t] evidence to justify the verdict.'" *Knecht v. Evridge*, 2020 S.D. 9, ¶ 37, 940 N.W.2d 318, 330 (alterations in original) (quoting SDCL 15-6-59(a)(5)-(6)). "Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion." *Biegler*, 2001 S.D. 13, ¶ 17, 621 N.W.2d at 598 (citation omitted).

[¶56.]     When assessing whether an award of punitive damages is excessive, this Court considers: "(1) the amount allowed in compensatory damages, (2) the nature and enormity of the wrong, (3) the intent of the wrongdoer, (4) the wrongdoer's financial condition, and (5) all of the circumstances attendant to the wrongdoer's actions." *Grynberg v. Citation Oil & Gas Corp.*, 1997 S.D. 121, ¶ 37, 573 N.W.2d 493, 504 (citing *Flockhart v. Wyant*, 467 N.W.2d 473, 479 (S.D. 1991)).

[¶57.]     "[T]his Court gives the benefit of the doubt to the jury's verdict." *Id.* ¶ 36. "The question is not whether the trial court or this [C]ourt, as triers of facts, would have awarded a less amount. Unless the verdict is so large as to clearly indicate that it must have been given under the influence of passion or prejudice, it should stand." *Id.* (quoting *Stene v. Hillgren*, 78 S.D. 1, 98 N.W.2d 156, 159 (1959)). Accordingly, this Court "will not uphold punitive damages awards that are oppressive or so large as to shock the sense of fair-minded persons." *Id.* (citing *Hulstein v. Meilman Food Indus.*, 293 N.W.2d 889, 892 (S.D. 1980)).

[¶58.]     Regarding the first consideration, the jury awarded $250,000 in bad faith compensatory damages and $400,000 in breach of contract compensatory damages. Focusing on the compensatory damages for Fiechtner's bad faith claim, the ratio between that award and the award of punitive damages is just over three and a half to one (890,000/250,000 = 3.56). *See Biegler*, 2001 S.D. 13, ¶ 49, 621 N.W.2d at 605 (finding "no cause for concern [ ] where the punitive award is merely four times that of the compensatory award"). For the second and third considerations, the nature of the wrong is that of an insurance company that failed in its duty to reasonably investigate a UIM claim or pay a claim to its insured.

Fiechtner complained of head and neck pain, vision issues, and failing memory. He sought medical treatment from several healthcare providers who ultimately were not able to ameliorate his conditions. Several of his healthcare providers explained that Fiechtner's symptoms are common after a head injury, and Kramer admitted that she did not question that Fiechtner had suffered some head injury. Despite the inherent intricacy of a head injury, Kramer limited her investigation of Fiechtner's UIM claim to the documents that his counsel submitted and did not otherwise expand the scope of her inquiry to ensure her offer fairly represented an accurate value of Fiechtner's UIM claim. The fourth consideration is the wrongdoer's financial condition. Oen, the Vice President of claims for American West, testified at trial that the approximate net worth of the company that owns American West was between $250–300 million.

[¶59.] While the jury's punitive damages award was significant, so was its award of compensatory damages. The jury heard extensive evidence about the specific claim investigation in this case and how claim investigations are handled generally at American West. In view of the facts of the case and the deference afforded to the jury's verdict, the circuit court did not abuse its discretion when it denied American West's motion for a new trial on the ground the punitive damages award was excessive.

> **2.      Whether the circuit court clearly erred when it found American West's refusal of Fiechtner's UIM claim was vexatious or without reasonable cause when assessing attorney fees under SDCL 58-12-3.**

[¶60.] After trial, Fiechtner's counsel filed an affidavit requesting an award of statutory attorney fees pursuant to SDCL 58-12-3. The affidavit averred that

Fiechtner's counsel's hourly rate was $350 during the relevant timeframe and included a log of the time spent on the case. Based on those submissions, Fiechtner's counsel requested $196,632.97 in attorney fees and $12,191.24 in sales tax on those fees. American West opposed the attorney fee request. After a hearing, the circuit court awarded $96,045 in attorney fees and $5,954.79 in sales tax on those fees (a combined $101,999.79). The circuit court did not enter written findings of fact and conclusions of law related to the attorney fees request. Because the settled record does not contain a transcript of the hearing where the court addressed the motion for attorney fees, it is unclear whether the circuit court made oral findings and conclusions. American West appeals, claiming there were no facts presented that could establish that it acted vexatiously or unreasonably.

[¶61.] Attorney fees may be awarded when they are authorized by statute. *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 32, 827 N.W.2d 55, 67. "The party requesting an award of attorney[ ] fees has the burden to show its basis by a preponderance of the evidence." *Bertelsen III*, 2013 S.D. 44, ¶ 28, 833 N.W.2d at 557 (quoting *Arrowhead Ridge I, LLC v. Cold Stone Creamery, Inc.*, 2011 S.D. 38, ¶ 25, 800 N.W.2d 730, 737). Under SDCL 58-12-3, attorney fees are allowed in this kind of case:

> In all actions or proceedings hereafter commenced against any
> . . . insurance company, . . . on any policy . . . if it appears from
> the evidence that such company . . . has refused to pay the full
> amount of such loss, and that such refusal is vexatious or
> without reasonable cause, . . . the trial court and the appellate
> court, shall, if judgment is rendered for the plaintiff, allow the
> plaintiff a reasonable sum as an attorney's fee to be recovered
> and collected as a part of the costs[.]

[¶62.] "The [circuit] court's decision of whether the insurer's conduct was vexatious or without reasonable cause is a finding of fact and thus will not be reversed unless the decision was clearly erroneous." *Kern v. Progressive N. Ins. Co.*, 2016 S.D. 52, ¶ 32, 883 N.W.2d 511, 518 (citing *Sawyer v. Farm Bureau Mut. Ins. Co.*, 2000 S.D. 144, ¶ 29, 619 N.W.2d 644, 652).

[¶63.] "The obvious objective of SDCL 58-12-3 is to discourage contesting insurance coverage and to reimburse an insured for any reasonable attorney[ ] fees necessarily incurred in defending or enforcing a valid insurance contract right." *All Nation Ins. Co. v. Brown*, 344 N.W.2d 493, 494 (S.D. 1984). Because SDCL 58-12-3 is premised on the contractual relationship between the parties, only fees related to enforcing the contract or policy are recoverable. *Bertelsen III*, 2013 S.D. 44, ¶ 31, 833 N.W.2d at 558. Moreover, "the portion of attorney[ ] fees related to the bad faith claim . . . should [be] excluded" and "[p]roof of bad faith does not necessarily entitle a claimant to recover attorney[ ] fees under SDCL 58-12-3." *Id.* (second alteration in original) (citations omitted).

[¶64.] American West does not appear to challenge the reasonableness of the attorney fee award or argue that the circuit court's ultimate decision to award attorney fees was an abuse of discretion. Instead, it argues that the circuit court committed clear error when it found that its denial of Fiechtner's UIM claim was vexatious or without reasonable cause. American West points to the same set of facts that undergird the appellate issues analyzed above—because the jury awarded breach of contract damages amounting to the approximate midpoint between the

parties' pre-litigation valuation of Fiechtner's UIM claim, its denial was not without reasonable cause.

[¶65.] "This Court has consistently required a trial court to enter findings of fact and conclusions of law when ruling on a request for attorney[ ] fees." *Hoffman v. Olsen*, 2003 S.D. 26, ¶ 10, 658 N.W.2d 790, 793 (citing *Pengra v. Pengra*, 429 N.W.2d 754, 757 (S.D. 1988)). "Without findings of facts and conclusions of law there is nothing to review." *Nickles v. Nickles*, 2015 S.D. 40, ¶ 35, 865 N.W.2d 142, 154 (quoting *Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 30, 687 N.W.2d 507, 514).

[¶66.] Our review of the circuit court's attorney fee decision is hampered by the fact that the record does not contain a transcript of the hearing where the court considered and granted the attorney fee request. As a result, this Court is prevented from determining whether the circuit court entered oral findings and from reviewing its legal analysis. In such instances, "this Court's 'presumption is that the circuit court acted properly.'" *Goeden v. Goeden*, 2024 S.D. 51, ¶ 41, 11 N.W.3d 768, 781 (quoting *Graff v. Children's Care Hosp. & Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489).

[¶67.] Both parties represent in their appellate briefing that the circuit court found that American West's denial was vexatious or unreasonable. The circuit court had the benefit of observing the trial and its many subtleties. It heard the witnesses—specifically Kramer and Oen—testify about the nature of Kramer's investigation and American West's claim procedures. During her testimony, Kramer admitted that during her investigation, she did not attempt to contact

Fiechtner, did not attempt to contact any of Fiechtner's treating healthcare providers, and did not review the entirety of American West's claim notes relating to Fiechtner's claim (and was prohibited from doing so), and that her investigation of the UIM claim was limited to a review of the records that Fiechtner's counsel submitted and a search of Fiechtner's social media accounts. Based on this evidence, the circuit court could have determined that American West's investigation of Fiechtner's UIM claim was not conducted reasonably. "[I]f an insurer refuses coverage after making 'an inadequate investigation' of a claim, such refusal is 'without reasonable cause.'" *Lagler v. Menard, Inc.*, 2018 S.D. 53, ¶ 45, 915 N.W.2d 707, 720 (quoting *Eldridge v. Nw. G.F. Mut. Ins. Co.*, 88 S.D. 426, 434, 221 N.W.2d 16, 21 (1974)). Based on the evidence in the record, the circuit court did not clearly err when it found that American West's denial of UIM benefits was vexatious or without reasonable cause.

### 3. Whether the circuit court abused its discretion regarding evidentiary issues.

[¶68.]        This Court reviews "a circuit court's evidentiary rulings by utilizing a 'two-step process.'" *Weiland*, 2025 S.D. 9, ¶ 58, 18 N.W.3d at 161 (quoting *Sedlacek v. Prussman Contracting, Inc.*, 2020 S.D. 18, ¶ 16, 941 N.W.2d 819, 822). "First, we 'determine whether the trial court abused its discretion in making an evidentiary ruling.'" *Id.* (citation omitted). "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, which, on full consideration, is arbitrary or unreasonable.'" *Id.* ¶ 57, 18 N.W.3d at 161 (quoting *Weber v. Weber*, 2023 S.D. 64, ¶ 15, 999 N.W.2d 230, 234). "[S]econd, we determine, 'whether this error was a prejudicial error[.]'" *Id.* (first alteration in original)

(citation omitted). An error is prejudicial when there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Id.* (alteration in original) (citation omitted).

[¶69.] American West focuses its evidentiary-related appellate argument on two pieces of evidence. The first is what was referred to as the "claims dollar exhibit." The second is the slideshow presentation that the jury viewed during the video deposition of Dr. Chaudry, Fiechtner's expert witness.

### a. *Claims Dollar Exhibit*

[¶70.] The claims dollar exhibit was a demonstrative exhibit that Fiechtner's counsel prepared before trial. Neither party asserted that the jury had access to this exhibit during its deliberations. American West primarily argues that Fiechtner failed to lay a sufficient foundation for the claims dollar exhibit before he published it as a demonstrative exhibit. It also points out that it did not receive a copy of the exhibit before trial.

[¶71.] This Court "has long recognized the admissibility of demonstrative evidence." *State v. Shelton*, 2021 S.D. 22, ¶ 23, 958 N.W.2d 721, 729 (citation omitted). "The purpose of demonstrative evidence is not its standalone probative value but rather making other admitted evidence [or testimony] easier for the jury to comprehend." *Id.* (alteration added) (citing Robert P. Mosteller, et al., *McCormick on Evidence* § 214 (8th ed. 2020)). "A demonstrative or illustrative exhibit 'is admissible if it clearly depicts the factual situations and will allow the trier of facts to more clearly understand a witness's descriptions.'" *Id.* (quoting *Kaiser v. Univ. Physicians Clinic*, 2006 S.D. 95, ¶ 24 n.3, 724 N.W.2d 186, 192 n.3).

[¶72.]     At trial, Fiechtner called Oen as a witness. During part of Oen's direct examination, Fiechtner questioned Oen about how premium payments are used and distributed throughout an insurance company. During this line of questioning, Fiechtner published the claims dollar exhibit before establishing a foundation or requesting its admission. American West objected and explained that "before we publish things via the monitor, I'd like to make sure they're admitted into [evidence] first." Fiechtner responded, "Judge, it's a picture of a dollar." The circuit court directed Fiechtner's counsel to offer the demonstrative exhibit before publishing it to the jury. Fiechtner resumed questioning Oen about the insurance industry and how premium payments are processed. Fiechtner eventually offered the claims dollar exhibit as a demonstrative exhibit. American West objected again on the basis that Fiechtner had not laid a sufficient foundation for the admissibility of the exhibit. The circuit court overruled American West's objection.

[¶73.]     The foundational requirements of demonstrative evidence call for a preliminary determination that the evidence "clearly depicts the factual situations and will allow the trier of fact to more clearly understand a witness's descriptions." *Shelton*, 2021 S.D. 22, ¶ 23, 958 N.W.2d at 729 (citation omitted). Throughout the relevant portions of Oen's testimony, he demonstrated that he possessed an acute understanding of how premium payments are processed by insurance companies and of the insurance industry at large. The claims dollar exhibit was not complicated. It simply depicted what Oen testified about before the circuit court received it into evidence, and Oen confirmed as much. The circuit court did not abuse its discretion when it received the claims dollar exhibit into evidence.

###### b.     Dr. Chaudry's Slideshow Presentation

[¶74.]     Fiechtner hired Dr. Chaudry, a neuroradiologist, as an expert witness. Dr. Chaudry testified in his deposition that he diagnoses medical issues in the brain and spine and was hired to review Fiechtner's MRI to assess whether he had a brain injury.  Dr. Chaudry authored a report following his review of the MRI. During his deposition testimony, Dr. Chaudry shared a slideshow presentation he prepared to help explain how brain injuries occur.  American West objected to the slideshow presentation at Dr. Chaudry's deposition.

[¶75.]     Fiechtner was unable to secure Dr. Chaudry's attendance at trial. Fiechtner instead opted to play the video recording of his deposition testimony. Before doing so, the circuit court reviewed the video recording and overruled the objections made when it was recorded.  When Fiechtner offered the recording of Dr. Chaudry's deposition at trial, American West renewed its objections.

[¶76.]     On appeal, American West suggests there was an insufficient foundation for the slideshow presentation to be displayed in connection with Dr. Chaudry's deposition testimony.  It argues that the visual aids that were used in the slideshow do not accurately depict how Fiechtner may have injured his head and that it was improper for Fiechtner's counsel to assist Dr. Chaudry in the production of the slideshow.  American West also submits that when Dr. Chaudry presented the slideshow presentation during his deposition, his testimony morphed into narration.  Finally, American West argues that Fiechtner violated the circuit court's pretrial order because it did not separately identify the slideshow as a trial exhibit.

[¶77.] The foundation principles discussed at ¶ 71, *supra*, are applicable here as well. During Dr. Chaudry's deposition, he was questioned regarding the nature of his review of Fiechtner's MRI and was asked to discuss his findings. To provide context for his findings, Dr. Chaudry also testified more generally about how brain injuries may occur and what they may look like on an MRI reading. After this line of questioning, Fiechtner requested that Dr. Chaudry present the slideshow presentation and American West objected to it. Prior to trial, the circuit court overruled that objection.

[¶78.] During his deposition, Fiechtner elicited testimony from Dr. Chaudry that the slideshow presentation would help explain his testimony to the jury. Dr. Chaudry specifically testified:

> [Fiechtner] was involved in a T-bone collision. So after my report, I found out the patient was involved in a car accident. It was a T-bone collision. So, yeah, so this is my understanding of the type of T-bone collision. And this [in reference to a visual aid] is just sort of showing what happens. The middle picture shows, like, what happens biomechanically as patients, you know, are involved in a car accident like this, where there is multiple rotational forces at play. And this third sort of series of images is showing you like how the head is moving.

Additionally, some of the imagery depicted Dr. Chaudry's testimony about how brain injuries can happen. The record establishes that the purpose of the slideshow presentation was to assist the jurors in visualizing and understanding Dr. Chaudry's testimony. The circuit court did not abuse its discretion when it denied American West's objection based on a lack of foundation.

[¶79.] Similarly, the circuit court did not abuse its discretion regarding American West's objection that Dr. Chaudry testified in the form of a narrative.

SDCL 19-19-611(a) grants the circuit court "reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) [m]ake those procedures effective for determining the truth; [and] (2) [a]void wasting time[.]" Dr. Chaudry's testimony was complex and pertained to the intricate nature of brain injuries and how they occur. Consequently, although his answers were detailed and lengthy, they were directly responsive to the questions he was asked. The circuit court reviewed Dr. Chaudry's deposition recording before it was played for the jury. The circuit court could have reasonably concluded that given the complexity of Dr. Chaudry's testimony, Dr. Chaudry's longer answers to counsel's questions were an effective mode of examination because it would allow the jury to understand his testimony more easily.

[¶80.] Finally, the circuit court did not abuse its discretion regarding American West's objection on the basis that Fiechtner did not disclose the slideshow presentation during discovery before trial. In Fiechtner's pretrial disclosures, he indicated that he intended to play Dr. Chaudry's recorded deposition for the jury and that he would contemporaneously introduce Dr. Chaudry's curriculum vitae and images from Fiechtner's MRI. The purpose of discovery statutes and pretrial orders requiring parties to disclose the exhibits they intend to utilize at trial is to "eliminate trial by ambush." *City of Sioux Falls v. Missouri Basin Mun. Power Agency*, 2004 S.D. 14, ¶ 16, 675 N.W.2d 739, 744 (citation omitted). Fiechtner properly advised American West that it intended to offer Dr. Chaudry's deposition as evidence to the jury because Dr. Chaudry was unavailable. American West was fully aware of the existence of this slideshow presentation because it attended and

participated in Dr. Chaudry's deposition.  In this context, American West cannot legitimately claim any late disclosure or surprise about the contents of the deposition or the slideshow presentation.  We affirm.

[¶81.]		KERN and DEVANEY, Justices, concur.

[¶82.]		JENSEN, Chief Justice, and SALTER, Justice, concur specially.

JENSEN, Chief Justice (concurring and concurring specially).

[¶83.]		I join the majority opinion in affirming on all issues, but I concur specially on the first party bad faith issue.

[¶84.]		A court reviewing the legal sufficiency of the evidence to support a bad faith claim premised upon an unreasonable investigation by an insurer must distinguish between evidence that the unreasonable investigation supports the "'absence of a reasonable basis for denial of policy benefits[,]'" and evidence that the carrier should have conducted a more thorough investigation.  *Walz v. Fireman's Fund Ins. Co.*, 1996 S.D. 135, ¶ 7, 556 N.W.2d 68, 70 (quoting *In re Certification of a Question of L. (Champion v. U.S. Fid. & Guar. Co.)*, 399 N.W.2d 320, 324 (S.D. 1987)) (citations omitted).  An insurer must have an objectively reasonable basis for denying the claim, but this does not mean that the carrier must definitively establish the value of the claim or disprove the demand as a part of its investigation.  It simply means that the carrier had a reasonable basis to value and/or deny the claim.  *See In re Certification of a Question of L. (Champion)*, 399 N.W.2d at 324 (citations omitted) (an insurer will be found liable only where it has intentionally denied, "'or failed to process or pay[] a claim without a reasonable basis.'") (citation omitted).

[¶85.] Sufficient evidence exists on this record to support the court's denial of the motion for judgment as a matter of law on the bad faith claim. Fiechtner's demand to American West included medical records that plausibly supported his claim that the accident caused permanent and disabling injuries to his head and neck, including significant ongoing pain, memory loss, and vision deficits, the latter of which was described as convergence insufficiency.[2] Rather than investigating the extent of Fiechtner's injuries caused by the accident, Kramer's report questioned, but did not investigate, causation, permanency, and the extent of Fiechtner's injuries. For instance, despite the absence of documented similar pre-existing issues or a medical opinion supporting the conclusion, Kramer speculated that "[i]t is certainly questionable if continuous neck pain, memory issues, and visual disturbances are a direct result from this accident as all could be degenerative/result of getting older." Fiechtner also presented evidence at trial that Kramer's view of his "visual disturbances" was contrary to a letter written by one of Fiechtner's treating physicians one year before Kramer's report, connecting Fiechtner's convergence insufficiency to the accident, stating that "[i]t's well researched that visual deficits can occur after a head injury. Convergence insufficiency is one of the most common findings that we see after a head injury."

---

2.      Convergence insufficiency is an eye condition where the eyes have difficulty working together to focus. *See* Daniel Porter, *Convergence Insufficiency*, American Academy of Ophthalmology (May 18, 2021). https://www.aao.org/eye-health/diseases/what-is-convergence-insufficiency. Symptoms may include eye strain, headaches, and blurred or double vision. *See id.*

[¶86.]     The questions of causation and permanency were crucial to arriving at an objectively reasonable basis to value Fiechtner's UIM claim. Yet Kramer failed to conduct any investigation or obtain an independent expert medical review to resolve these questions, beyond a review of Fiechtner's medical records, most of which were more than a year old at the time of the demand.

[¶87.]     Considering this evidence, a jury could conclude that American West unreasonably denied the claim by placing an arbitrary value on the UIM claim that was objectively unreasonable and that it did so intentionally. *See Dakota, Minn. & E. R.R. Corp. v. Acuity*, 2009 S.D. 69, ¶ 24, 771 N.W.2d 623, 631 (determining jury questions existed on the elements of bad faith and whether the claim was fairly debatable where liability for a UIM claim was denied based upon the adjustor's review of an inconclusive accident report; his erroneous conclusion that there were no independent eyewitnesses; and the fact that the insurer "did not conduct any further investigation into the accident[;]" and the insurer had "not shown that it made attempts to interview the insured, interview the eye-witnesses to the accident that it knew existed, or investigate any of the actual facts of the accident."). *But see Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 15, 915 N.W.2d 697, 702 (affirming summary judgment on a bad faith claim from an underlying uninsured claim where the insurer "sent all of the medical records to an orthopedic surgeon for a medical review[;] . . . the doctor opined that [the insured] suffered a 'mild cervical strain' from the accident and that the amount and duration of medical care based upon this diagnosis was unusual and prolonged[;]" and the doctor determined the insured had not sustained a permanent injury as a result of the accident).

[¶88.]     For these reasons, I would affirm the circuit court's denial of the motion for judgment as a matter of law.

SALTER, Justice (concurring specially).

[¶89.]     I join the Court's opinion and write specially to offer my view that the "fairly debatable" defense is simply a corollary of the first element of first-party bad faith, or perhaps a restatement of the first element formulated from the insurer's perspective.  One cannot exist without the other.

[¶90.]     In *Dakota, Minnesota & Eastern Railroad Corporation v. Acuity*, we held that "[i]f the claim is fairly debatable, then the insurer has a reasonable basis to deny the claim."  2009 S.D. 69, ¶ 20, 771 N.W.2d 623, 630.  When this principle is turned around, it remains equally true—an insurer lacks a reasonable basis for denial where the claim is not fairly debatable.  *See Bertelsen v. Allstate Ins.*, 2011 S.D. 13, ¶ 36, 796 N.W.2d 685, 698 (holding that an insurer lacked a reasonable basis for denial because a claim was not fairly debatable, leaving only the question of "intent in failing to pay benefits" for the jury).

[¶91.]     I also believe that the Chief Justice's writing is helpful to the broader first-party bad faith discussion because it draws particular attention to the necessity of a reasonable basis for denying an insured's claim.  A carrier may well dispute a high demand by an insured, particularly one that seeks compensation for imprecise non-economic damages.  But the insurer must have a reasonable basis for denying the claim, or offering less, in order to successfully invoke the fair part of fairly debatable.

[¶92.] And though we are concerned with the tort of bad faith—not bad investigations—the two can be closely related and operate in concert under the theory that an insurer's inadequate investigation deprived it of a reasonable basis for denial because it led to an inaccurate valuation or assessment of the claim. *See Case v. Toshiba Am. Info. Sys., Inc.*, 7 F.3d 771, 773 (8th Cir. 1993) (noting that under South Dakota law "whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review" are "integral" to the bad faith inquiry (quoting *In re Certification of a Question of L. (Champion v. U.S. Fid. & Guar. Co.*), 399 N.W.2d 320, 324 (S.D. 1987))).

[¶93.] Here, the jury could have concluded that Kramer's investigation was passive and insular and not responsive to the specific claims Fiechtner asserted for the reasons set out by my colleagues. This finding would, in turn, deprive American West of a reasonable basis for denial, meaning its debate with Fiechtner's demand was not a fair one.